# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.    8:18-MJ-00454 |
| | ) | |
| 605 South Parton Street | ) | |
| Santa Ana, CA 92701 | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Sections 2422(b) and 2252A(a)(5)(B) | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Tim Kirkham, Special Agent HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Santa Ana, CA _____

Honarable Steve Kim, U.S. Magistrate Judge
*Printed name and title*

AUSA: B. Marrett:cp

## **AFFIDAVIT**

I, Timothy Kirkham, being duly sworn, do hereby depose and state:

## **I.    INTRODUCTION**

1.    I am a Special Agent with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), assigned to the Special Agent in Charge in Los Angeles, Office of the Assistant Special Agent in Charge, Orange County, California.  I have been so employed since September 2007.  As part of my Special Agent training, I attended a 22-week training academy at the Federal Law Enforcement Training Center in Glynco, Georgia.  As part of my daily duties as an ICE agent, I investigate, among other things, offenses related to the sexual exploitation of children and child pornography in the Central District of California as part of the HSI Office of the Assistant Special Agent in Charge, Orange County, Child Exploitation Investigations Group ("CEIG").  HSI's Orange County CEIG is responsible for enforcing federal criminal statutes that prohibit the sexual exploitation of children under 18 U.S.C. § 2251 et seq.

2.    I have received training regarding the investigation of child pornography and child exploitation offenses.  In that capacity, I have become familiar with numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media, including digital media.  I have also participated in the

1

execution of numerous search warrants, many of which were executed as part of investigations of child exploitation and child pornography offenses.  I have also conducted, participated in, and received training in numerous investigations of criminal activity, including, but not limited to, the investigation of narcotics offenses, money laundering, fraud, child pornography, alien smuggling, human trafficking, and Title III wire communication interception investigations.  During the investigation of these matters, I have executed, and participated in the execution of, search warrants, and have seized materials constituting evidence of offenses in violation of the United States Code.

## II.  <u>PURPOSE OF AFFIDAVIT</u>

3.    This affidavit is made in support of an application for a warrant to search the premises located at 605 South Parton Street, Santa Ana, CA 92701, more fully described below and in Attachment A, which is attached hereto and incorporated herein by reference, and to seize evidence, fruits, and instrumentalities of criminal conduct, as specified in Attachment B, which is also attached hereto and incorporated by reference, of violations of 18 U.S.C. § 2422(b) (Use of a Facility of Interstate Commerce To Attempt To Induce a Minor To Engage in Illegal Sexual Activity) and 2252A(a)(5)(B) (possession of child pornography).

4.    The facts set forth in this affidavit are based upon my personal observations, training, and information related to

2

me by other law enforcement officials and witnesses.  Because
this affidavit is being submitted for the limited purpose of
securing a search warrant, I have not included each and every
fact known to me concerning this investigation.

### III.  <u>PREMISES TO BE SEARCHED</u>

5.   The premises to be searched is the property located at
605 South Parton Street, Santa Ana, CA 92701 (the "SUBJECT
PREMISES").  The SUBJECT PREMISES is located on the east side of
South Parton Street south of West Bishop Street.  The SUBJECT
PREMISES is a single family residence with a beige stucco
façade, light brown shingle roof, and brown eaves.  The driveway
is in the west side of the residence and access to the driveway
is controlled by a Silver metal gate.  "605" is painted on the
curb on the north side of the driveway, in front of the
residence.  A detached garage is located in the backyard on the
west side of the property.  The front yard has dense tree growth
on each side of a concrete walkway that leads to the front door,
which has a black metal security door.

### IV.  <u>SUMMARY OF INVESTIGATION</u>

6.   On August 23, 2018, I received information from HSI –
El Centro Group Supervisor Michael W. Harvey regarding Eric
Guardado Solis, date of birth July 21, 1985, Social Security
number 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 (SOLIS).  According to the information
received, SOLIS had been chatting on Mocospace with an
undercover officer (UC) posing as a 13-year-old female.  The

chat between SOLIS and the UC became sexualized and resulted in SOLIS arranging to meet with a person who SOLIS believed to be a 13-year-old girl for the purpose of engaging in sexual activity in violation of California Penal Code 261.5 (Any person 21 years of age or older who engages in an act of unlawful sexual intercourse with a minor who is under 16 years of age).

7. On August 23, 2018, at approximately 1650 hours, HSI – Special Agent (SA) Kevin Leduc (Leduc) conducted a site survey at the SUBJECT PREMISES. During the survey, SA Leduc observed a Silver Toyota Corolla parked curbside in front of the residence. HSI – El Centro subsequently advised me that the suspect is believed to be driving a silver Toyota Corolla.

8. On August 24, 2018, at approximately 0545 hours, I conducted a site survey of the subject premises and observed that the silver Toyota Corolla was parked in the same spot as observed by SA Leduc on the previous evening. HSI – Orange County established surveillance at the SUBJECT PREMISES at approximately 0615 hours. At approximately 0835, SA Leduc observed SOLIS exiting the SUBJECT PREMISES get into the silver Toyota Corolla and proceeded to drive in the direction of Brawley, California, where SOLIS had arranged to meet who he believed to be a 13 year old girl for the purpose of engaging in sexual intercourse. HSI – Orange County terminated surveillance at approximately 1000 hours while on the 60 east at the Day street exit.

9.   On August 24, 2018, at approximately 1154 hours, SOLIS was arrested by HSI – El Centro when he arrived to the pre-arranged location for the purpose of engaging in sexual intercourse with a person who he believed to be a 13 year old girl.

10.   Thus, there is probable cause to believe that the SUBJECT PREMISES contains evidence of criminal activity in violation of 18 U.S.C. § 2422(b) (Use of a Facility of Interstate Commerce To Attempt To Induce a Minor To Engage in Illegal Sexual Activity), and 2252A(a)(5)(B) (possession of child pornography).

## V.   STATEMENT OF PROBABLE CAUSE

### A.   Mocospace Chats

11.   on August 21, 2018, at approximately 1340 hours, an HSI – El Centro undercover agent was logged into the Mocospace[1] chat platform with a decoy profile to appear as a young female based on the profile picture.  The UC user name was displayed as "Balletgirl760" with an initial location set as Los Angeles, California.  It should be noted that the platform prohibited minors to partake in the chats.  The age of the UC profile was displayed as 43 years old as a conversation booster because the

---

[1] Mocospace is a social media platform.  Mocospace allows subscribers to create accounts and maintain social networking pages that displays personal information to other users, which allows the users to identify each other. Mocospace allows users to engage in private chats with each other and is accessible on mobile phones and computers.

age did not match the profile picture.  While on the platform, the UC received numerous friend requests from various male subjects.  One of the friend requests was a male subject with a screen name "Whetstone".  On his profile, Whetstone displayed himself as a 33 year old male from Santa Ana, California with his name "Eric".  The UC accepted the friend request from Whetstone.  Below are excerpts from the chatting that occurred on August 21, 2018.

     a. Whetstone – "Hey Cutie."

     b. Balletgirl760 – "hey ty"

     c. Whetstone – "You're very welcome..wyd"

     d. Whetstone – "So like, you're obviously not 43, are you?"

     e. Balletgirl760 – "haha no. im almost 14.jusd gettn out of class"

     f. Whetstone – "Nice..don't mind an older man do you?" "Are you a talented dancer?"

     g. Balletgirl760 – "how old ru?"

     h. Whetstone – I'm 33..that cool with you?"

     i. Whetstone – "Need a training partner?"

     j. Whetstone – "Honestly that sounds like something I'd love to watch."  "I'd Still enjoy it..you practice in booty shorts?"

k. Balletgirl760 – "ya sometimes. Its better 4 stretching."

l. Whetstone – "Are you a virgin."

m. Balletgirl760 – "huh?"

n. Whetstone – "I bet it's better for stretching plus very entertaining for the men."  "Ever been fucked?"

o. Balletgirl760 – "My exbyfrnd wanted 2 but hes a jerk."  "I don't want to get in truble with my mom."

p. Whetstone – "Why is he a jerk? Sothen you're a virgin?"  "Who says you'd get in trouble with your mom if she ain't know."

q. Balletgirl760 – "I dnt no. he touchd dow their/"

r. Whetstone – "Did his fingers go in you?"

s. Balletgirl760 – "a little but I didn't like it 2 much."

t. Whetstone – "why not? Did it hurt?"

u. Balletgirl760 – "yea, a little."  "im not sure, sounds skary."

v. Whetstone – "Ha..that's a virgin thing to say."  "Not scary at all, honestly on the contrary..very pleasurable."

w. Balletgirl760 – "I should wait tho."

x. Whetstone – "Still scared?"

y. Balletgirl760 – "ya"

z. Whetstone – "Lol..the first time always hurts babygirl..there's no way around it."

aa.  Balletgirl760 – "I just don't want to get hurt."

bb.  Whetstone – "Once your able to do the splits on a dick, you'll be ready.."  "Hurt like your feelings? Or hurt physically from fucking?"

cc.  Balletgirl760 – "both"

dd.  Whetstone – "But your pussy will stretch to the size of the dick of whoever's fucking you."

ee.  Balletgirl760 – "is that tru?"

ff.  Whetstone – "Let's say your fucking a guy whos big and thick for a couple of months, and say you break up..your pussy will return to its normal size."  "Want to peek at my cock?"

gg.  Balletgirl760 – "not sure"  "migt be skary"

hh.  Whetstone – "Let me show you, tell me what you think."  The next message was a picture of an adult males penis from.  The photograph was taken from below the penis so the males testicles and mid-section are also visible in the image.

ii.  Balletgirl760 – "mmmm"  "never saw 1"  "that big omg"

jj.  Whetstone – sent another image of an adult male penis.

kk.  Whetstone – "When you get older and sexually
    active your going to want and crave really big."
    "I'll take it slow and easy on you at first."

ll.  Balletgirl760 – "k"  "ty"

mm.  Whetstone – "Interested"  Whetstone then sent
    another picture of an adult male penis being held
    onto by an adult males hand.

nn.  Whetstone – "Im here in orange county if you
    really interested, we could set up a appointment"
    "Have a number I could message to chat offline?"

oo.  Balletgirl760 – "my mom chcks my fone all the
    time. I hav an email tho."
    "kmgarcia13bwjh@gmail.com"

pp.  Whetstone – Sent a nude image of himself holding
    his penis in his right hand.  The subject is wearing
    only a green and white beanie and his room can be
    seen in the background.

qq.  Balletgirl760 – "sorry, I liv in brawley.  Didn't
    now how 2 put the rigt city/"  "is that 2 far 4 u?"

rr.  Whetstone – "Brawly..where'sthat?"  "I'll look it
    up.."  "I'll make the trip if you really interested
    in fucking around."

ss.  Balletgirl760 – "k sounds good. My mom is
    coomming."  "gotta go ttyl"

9

tt.  Whetstone – "I'll email you babe."

12.  The following chat excerpts are from August 22, 2018.

a. Whetstone – "BTW I looked up Brawley...Looks like your in te desert,am I right?"

b. Balletgirl760 – "hey. Yea. Don't have much time tho"

c. Balletgirl760 – "gotta go back to class soon"

d. Balletgirl760 – "yea, its in the desert"

e. Whetstone – "It's about 3 hours to get out there.. So if you have time on a weekend we could hook up"

f. Balletgirl760 – "my moms gonna go 2 my grandma on sunda afternoon"

g. Whetstone – "She gonna leave you at home?"

h. Balletgirl760 – "yea I am bord over their"

i. Balletgirl760 – "so I stay home"

j. Whetstone – "No one else gonna be home?"

k. Balletgirl760 – "class is startng soon"

l. Balletgirl760 – "no. she takes my baby sis with her"

m. Whetstone – "No dad at home?"

n. Balletgirl760 – "gotta go to class. Ttyl"

o. Whetstone – "k"

## B. Surveillance of SOLIS on August 24, 2018

13.  On August 23, 2018, at approximately 1650 hours, HSI – Special Agent (SA) Kevin Leduc (Leduc) conducted a site survey at the SUBJECT PREMISES.  During the survey, SA Leduc observed a

Silver Toyota Corolla 5XCR706, registered to Solis, Rosa Guardado, 605 South Parton, Santa Ana, California 92701 parked curbside in front of the residence.  HSI – El Centro subsequently advised me that the suspect is believed to be driving a silver Toyota Corolla.

14.   On August 24, 2018, at approximately 0545 hours, I conducted a site survey of the subject premises and observed that the silver Toyota Corolla California license plate 5XCR706, registered to Solis, Rosa Guardado, 605 South Parton, Santa Ana, California 92701, was parked in the same spot as observed by SA Leduc on the previous evening.  HSI – Orange County established surveillance at the SUBJECT PREMISES at approximately 0615 hours.  At approximately 0835, SA Leduc observed SOLIS exiting the SUBJECT PREMISES get into the silver Toyota Corolla and proceeded to drive in the direction of Brawley, California, where SOLIS had arranged to meet who he believed to be a 13-year-old girl for the purpose of engaging in sexual intercourse. HSI – Orange County terminated surveillance at approximately 1000 hours while on the 60 East at the Day street exit.

C.   **Post Arrest interview of SOLIS**

15.   On August 24, 2018, at approximately 1154 hours, SOLIS was arrested by HSI – El Centro when he arrived to the pre-arranged location for the purpose of engaging in sexual intercourse with a person who he believed to be a 13 year old girl.  I spoke with HSI Group Supervisor (GS) Michael Harvey

(Harvey) regarding the interview of SOLIS.  According to GS
Harvey, after SOLIS was advised of his Miranda rights, SOLIS
stated that he had child pornography on his cellular telephone.
Additionally, SOLIS stated that he had sex with a 16-year-old
girl in Fullerton, California.  The interview is still ongoing
and the identity of the 16 year-old victim is still being
determined.

## VI.  <u>TRAINING AND EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN</u>

16.  Based on the information above, there is probable
cause to believe that someone at the SUBJECT PREMISES possesses
child pornography and makes it available for distribution.
Based on my training and experience, and the training and
experience of other law enforcement officers with whom I have
had discussions, I have learned that individuals like these --
who view and possess multiple images of child pornography -- are
often individuals who have a sexual interest in children and in
images of children, and that there are certain characteristics
common to such individuals:

a.   Individuals who have a sexual interest in
children or images of children may receive sexual gratification,
stimulation, and satisfaction from contact with children or from
fantasies they may have from viewing children engaged in sexual
activity or in sexually suggestive poses, such as in person, in

photographs, or in other visual media, or from literature describing such activity.

      b.    Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

      c.    Individuals who have a sexual interest in children or images of children sometimes possess and maintain "hard copies" of child pornographic material – that is, pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc. When they do, they generally possess these materials in the privacy and security of their home or some other secure location.  Where individuals who have a sexual interest in children or images of children collect pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and/or videotapes, they often retain these materials for many years.

13

d.   Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the individual to view the collection, which is valued highly.

e.   Individuals who have a sexual interest in children or images of children may correspond with and/or meet others to share information and materials; often retain correspondence from other child pornography distributors/ collectors; conceal such correspondence as they do with their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f.   Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

17.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;

desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a

thorough search.  In addition, it may be necessary to consult
with specially trained personnel who have specific expertise in
the types of digital devices, operating systems, or software
applications that are being searched.

　　　　b.   Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,
compressed, encrypted, or password-protected data.  As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

　　　　c.   The volume of data stored on many digital devices
will typically be so large that it will be highly impractical to
search for data during the physical search of the premises.  A
single megabyte of storage space is the equivalent of 500
double-spaced pages of text.  A single gigabyte of storage
space, or 1,000 megabytes, is the equivalent of 500,000 double-
spaced pages of text.  Storage devices capable of storing 500 or
more gigabytes are now commonplace.  Consequently, just one
device might contain the equivalent of 250 million pages of
data, which, if printed out, would completely fill three 35' x
35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive

16

could contain as many as approximately 450 full run movies or
450,000 songs.

        d.   Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded
onto a hard drive, deleted, or viewed via the Internet.[2]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary

---

     [2] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

      e.   Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or

18

of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone

19

else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

g.    Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort

through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

18. As discussed herein, based on my training and experience I believe that digital devices will be found during the search. I know from my training and experience and my review of publicly available materials that Apple Inc., Motorola, HTC, and Samsung, among other companies, produce devices that can be unlocked by the user with a numerical or an alpha-numerical password, or, for some newer versions of the devices, with a fingerprint placed on a fingerprint sensor. Each company has a different name for its fingerprint sensor feature; for example, Apple's is called "Touch ID." Once a user has set up the fingerprint sensor feature in the security settings of the device, the user can unlock the device by placing a finger or thumb on the device's fingerprint sensor. If that sensor recognizes the fingerprint or thumbprint, the device unlocks. Most devices can be set up to recognize multiple prints, so that different prints, not necessarily from the same person, will unlock the device. In my training and experience, users of devices with a fingerprint sensor feature often enable that feature, because it unlocks the phone more quickly than the entry of a passcode or password but still offers a layer of security.

19.   In some circumstances, fingerprint sensors will not work, and a passcode must be entered to unlock the device.  For example, with Apple, Touch ID will not work if (1) more than 48 hours have passed since the device has been unlocked, (2) the device has been turned on or restarted, (3) the device has received a remote lock command, or (4) five attempts to match a fingerprint have been unsuccessful.  Other brands have similar restrictions.  I do not know the passcodes of the devices likely to be found at the SUBJECT PREMISES.

20.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.   **ITEMS TO BE SEIZED**

21.   Based on the foregoing, I respectfully submit that there is probable cause to believe that the items to be seized, listed in Attachment B, constitute evidence, fruits, and instrumentalities of violations of Title 18 U.S.C. § 2422(b) (Use of a Facility of Interstate Commerce To Attempt To Induce a Minor To Engage in Illegal Sexual Activity), and 2252A(a)(5)(B) (possession of child pornography).

//

//

22

## IX.   <u>CONCLUSION</u>

22.   For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2422(b) (Use of a Facility of Interstate Commerce to Attempt To Induce a Minor To Engage in Illegal Sexual Activity), and 2252A(a)(5)(B) (possession of child pornography), as described in Attachment B to this affidavit, will be found in a search of the SUBJECT PREMISES, which is further described above and in Attachment A of this affidavit.

_____
Tim Kirkham
Special Agent
Homeland Security Investigations

Subscribed to and sworn before me
on this 24th day of August 2018

_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### PREMISES TO BE SEARCHED

The premises to be searched is the property located at 605 South Parton Street, Santa Ana, CA 92701 (the "SUBJECT PREMISES"). The SUBJECT PREMISES is located on the east side of South Parton Street south of West Bishop Street. The SUBJECT PREMISES is a single family residence with a beige stucco façade, light brown shingle roof and brown eaves. The driveway is in the west side of the residence and access to the driveway is controlled by a Silver metal gate. "605" is painted on the curb on the north side of the driveway, in front of the residence. A detached garage is located in the backyard on the west side of the property. The front yard has dense tree growth on each side of a concrete walkway that leads to the front door, which has a black metal security door.

## ATTACHMENT B

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2422(b) (Use of a Facility of Interstate Commerce To Attempt To Induce a Minor To Engage in Illegal Sexual Activity), and 2252A(a)(5)(B) (possession of child pornography), namely:

a.   Child pornography, as defined in 18 U.S.C. § 2256(8).

b.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, ordering, requesting, or trading of child pornography, or documents that refer to a transaction of any kind involving child pornography.

c.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, ordering, requesting, or trading of child pornography, or involved in a

2

transaction of any kind involving child pornography, as defined in 18 U.S.C. § 2256(8).

d.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

e.   Any and all records, documents, programs, applications, materials, or items that are sexually arousing to individuals who are interested in minors, but that are not in and of themselves obscene or that do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques relating to child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

f.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to the use of Dropbox or other cloud storage providers to store child pornography or child erotica.

g.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

3

h.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of 4931 Paseo De Vega, Irvine, California 92603 (the "SUBJECT PREMISES"), limited to five (5) such records, documents, programs, applications, or materials, including electronic mail and electronic messages.

i.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital device(s) found inside the SUBJECT PREMISES, limited to five (5) such records, documents, programs, applications, or materials, including electronic mail and electronic messages, per digital device.

j.   Any digital device used to facilitate the above-listed violations and forensic copies thereof.

k.   With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

4

browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

       ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

       v.   evidence of the times the device was used;

       vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

       vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

       viii.    records of or information about
Internet Protocol addresses used by the device;

       ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,

search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) to an appropriate law
enforcement laboratory or similar facility to be searched at
that location.  The search team shall complete the search as
soon as is practicable but not to exceed 120 days from the date
of execution of the warrant.  The government will not search the
digital device(s) beyond this 120-day period without first
obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.   The search team may subject all of the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the list of
items to be seized.  The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

       ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

       c.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

       d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       e.  If the search determines that a digital device does contain data falling within the list of items to be seized,

8

the government may make and retain copies of such data, and may access such data at any time.

      f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

      g.   The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

      h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.